# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**CHERRILL L. CARTER,**

    **Plaintiff,**

    vs.                                           **CIVIL ACTION**
                                                                **No. 04-2338-JWL**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

    **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Cherrill Carter, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1383(c)(3) seeking judicial review of the decision of defendant, the Commissioner of Social Security (the "Commissioner"), to deny her application for supplemental security income under Title XVI of the Social Security Act.[1] Plaintiff claims that she is disabled because she suffers from intestinal toxemia with encephalopathy,[2] an illness she states is not recognized by current medical opinion. Plaintiff asserts that symptoms of this condition include offensive body odor, severe halitosis, gas, dizziness, chills, and fatigue. Moreover, plaintiff believes that she has progressed to the severe stage of this illness, which results in high levels of toxins circulating in the bloodstream causing brain dysfunction.

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence. In particular,

---

[1] The case was transferred to the undersigned judge after the death of the Honorable G. Thomas VanBebber.

[2] Plaintiff also refers to her illness as "intestinal dysbiosis," "autointoxication," and "gut-caused halitosis."

she maintains that the Commissioner failed to assign proper weight to the medical literature she submitted in support of her disability claim; denied her request to subpoena an expert witness; and erroneously discredited her evidence because of her failure to seek employment. For the reasons set forth below, the Commissioner's decision is affirmed.

## I. Procedural History

On January 22, 2002, plaintiff filed her application for supplemental security income in Missouri, claiming disability since September 1, 1995.[3] The application was denied initially and her case proceeded directly to the administrative law judge level as a result of Missouri's participation in testing modifications to the disability determination process. See 20 C.F.R. §§ 416.1406 and 416.1466. An administrative law judge ("ALJ") held a hearing on November 4, 2003, at which plaintiff represented herself. On March 26, 2004, the ALJ rendered a decision in which he determined that plaintiff was not under a "disability" as defined by the Social Security Act. After the ALJ's unfavorable decision, plaintiff requested review by the Appeals Council. The Appeals Council denied plaintiff's request for review on May 22, 2004, rendering the ALJ's decision the final decision of the Commissioner.

## II. Plaintiff's Medical Background

In October 1995, plaintiff received treatment from Dr. Mark Snell, D.O., for acne. In December 1995,

---

[3] Although plaintiff filed her claim in Missouri, the court has jurisdiction to review the final decision of the Commissioner because plaintiff resides in Olathe, Kansas. See 42 U.S.C. § 405(g) (stating that an "action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ."). The court notes, however, that plaintiff was a resident of Missouri during the entire administrative process for her claim and that the administrative decision being appealed by plaintiff was written under Eighth Circuit law. To the extent any differences exist between Tenth Circuit and Eighth Circuit law, the court finds that Eighth Circuit law applies. Nevertheless, the court is not aware of any differences that would affect the outcome of this case, and thus, the court cites to Tenth Circuit law throughout this opinion.

plaintiff informed Dr. Snell that she suffered from severe body odor and halitosis. Though she could not detect any odors herself, she claimed that others around her noticed the odors and avoided her. Dr. Snell could not confirm any body odor based on his experience of treating plaintiff, and he referred her to see Dr. Michael F. Hughes, M.D., for a consultation. In a letter dated January 30, 1996, Dr. Hughes advised Dr. Snell that the swelling, sore throat, and halitosis plaintiff had experienced over the past several weeks was chronic tonsil cryptitis, and he suggested she try dilute hydrogen peroxide gargle and a waterpik to remove the tonsil crypts. Dr. Hughes stated that if the treatment plan was unsuccessful, then plaintiff would become a candidate for a tonsillectomy. Dr. Snell saw plaintiff again on February 8. He observed that plaintiff was "preoccupied with her bad breath and her body odor" and noted that both conditions were "nonexistent." Dr. Snell also stated that plaintiff's tonsils were "pox marked" and he concurred with Dr. Hughes's opinion that plaintiff should have her tonsils removed. On June 27, plaintiff again complained to Dr. Snell that she had offensive body odor that everyone else noticed. Dr. Snell, however, commented that he had yet to detect any body odor on her at all.

On September 26, 1996, plaintiff visited the Truman Medical Center in Kansas City, Missouri, maintaining that she smelled bad and that people stayed away from her. The attending physician, Dr. Gonzalez, stated that plaintiff exhibited signs of mental instability and behavior problems, and recommended that she seek counseling. The record indicates, however, that plaintiff resisted this suggestion. Then on November 20, plaintiff sought treatment from Dr. Janice Goddard, D.O. At that time, plaintiff informed Dr. Goddard that people around her reacted negatively to her body odor, even though plaintiff herself could not smell it. Dr. Goddard observed that she could not detect any abnormal odor and asked plaintiff to undergo blood work.

3

Plaintiff never returned to get the blood work.[4]  On December 27, plaintiff saw Dr. Snell.  His progress notes state that plaintiff continued to have "obsessive compulsive problems" with thinking she has body odor.  He again detected "absolutely zero" body odor, and diagnosed plaintiff with obsessive compulsive disorder with psychogenic dysgeusia.

On March 21, 1997, Dr. Kay Barney, D.O., examined plaintiff for her complaints of body odor.  Dr. Barney stated that no odor was noted by her or her staff at any time during the exam, but she observed that plaintiff seemed "delusional in some of her thought processes."

Plaintiff received emergency room attention on November 3, 1997, complaining of fatigue, some diarrhea, and hot and cold chills.  The attending doctor diagnosed plaintiff with "fever, fatigue-etiology mononucleosis vs gastroenteritis" and recommended that she have several lab tests performed.  The doctor noted on November 18 that plaintiff did not have any further lab work done and that plaintiff was feeling better.  In particular, the physician noted that her fever had subsided and that it was likely that plaintiff had a self-limiting viral disease, along with some gastroentiritis.

Dr. Bradford Carper, D.O., treated plaintiff on April 20, 1999.  Plaintiff complained that she was unable to work because of an intestinal problem that caused her to feel weak, dizzy and nauseated.  Dr. Carper suggested that plaintiff undergo x-rays of her small bowel, several stool studies, and some blood work.  Plaintiff refused.

In 2000, plaintiff participated in fourteen sessions of outpatient psychotherapy with Adam Buhman-

---

[4]  Plaintiff contacted Dr. Goddard in September 1997 to request the record from her November 1996 examination.  During that visit, plaintiff told Dr. Goddard that she could not help her if she did not smell the odor.  Plaintiff refused Dr. Goddard's offer to help plaintiff pursue the issue through the medical community and to have blood work performed.

Wiggs, a Ph.D. candidate and licensed professional counselor. A letter from Mr. Buhman-Wiggs, dated May 23, 2001, summarized the evaluations he conducted. Specifically, he suggested the following provisional diagnoses as of September 27, 2000: adjustment disorder with anxiety and depression, generalized anxiety disorder, and undifferentiated somatoform disorder at Axis I; personality disorder at Axis II; and a Global Assessment of Functioning ("GAF") score of 55 at Axis V. Mr. Buhman-Wiggs qualified his diagnoses by stating that corroboration by others was unavailable, he lacked medical information regarding the intestinal disorder plaintiff insisted was present, and that it was outside his area of expertise and scope of experience to determine whether the psychological disorder(s) plaintiff endured qualified her for disability. He stated, however, that he believed that the disorder(s) "are chronic and cause clinically significant impairment in emotional and interpersonal functioning" and that plaintiff would "experience great difficulty functioning without extensive emotional, interpersonal, and possibly medical support."

Plaintiff visited Dr. David Shuss, M.D., on April 26, 2001, complaining of digestive track problems. His impression was that plaintiff suffered from irritable bowel syndrome. He asked plaintiff to have blood work and other lab tests performed, but plaintiff refused to undergo any testing that day. Dr. Shuss commented that he did not believe that she would proceed with further evaluation.

On July 3, 2001, Dr. Mark McPhee, Vice President for Medical Affairs and Chief Academic Officer for Saint Luke's Hospital in Kansas City, Missouri, informed plaintiff by letter that the tests she requested, "which involved gas chromatography for metabolic by-products and microflora-associated characteristics of organisms producing halitosis," were not available at Saint Luke's Hospital. He also noted "that these tests have not been viewed as scientifically valid or medically established in the diagnosis of treatment of this condition in the United States . . . ."

5

On August 6, 2001, Dr. Gary Horner, Ph.D., performed a psychological evaluation of plaintiff. Plaintiff reported to Dr. Horner a history of sexual abuse and domestic violence. She also informed him that she was disabled due to an intestinal disorder that could not be fully tested or treated in the United States, which caused her added distress, anxiety, and problems with concentration and sleep. Dr. Horner found that plaintiff's attention and concentration was fair to good, depending on the task; her ability to sustain concentration and persistence with detailed and simple tasks was generally adequate; and that her weakest area was her ability to relate socially and adapt to changes in her social environment. He diagnosed plaintiff with chronic, untreated post-traumatic stress disorder and anxiety disorder associated with a general medical condition at Axis I; untreated personality disorder with schizotypal and borderline features at Axis II; an intestinal disorder at Axis III; and a GAF score between 52-57 at Axis V. Dr. Horner opined, however, that her social problems would not preclude her from working.

Dr. Horner evaluated plaintiff again on May 3, 2002. Plaintiff informed him that she was not taking any medication, that her rare intestinal disorder was getting somewhat better, and that she did not believe that she needed additional mental health services. Dr. Horner observed that plaintiff's general psychosocial functioning appeared to be much improved since the last exam. In particular, Dr. Horner administered a mental status exam and concluded that plaintiff did not have any serious psychopathology as measured by the test. He found that at the present time, plaintiff did not have any mental health problems that led to restrictions in daily living or that impeded social functioning. Moreover, Dr. Horner diagnosed no problems at Axis I or Axis II, an intestinal disorder at Axis III, and a GAF score of 65 at Axis V.

Finally, psychologist John O'Rourke, MS, evaluated plaintiff on October 27, 2003. Plaintiff reported to him that since October 1997, she suffered from intestinal dysbiosis resulting in severe and offensive halitosis

and body odor. Mr. O'Rourke stated that plaintiff appeared to have severe delusional preoccupation about having an intestinal disorder and diagnosed plaintiff with a GAF score of 55.

### III.  Standard of Review

Judicial review under 42 U.S.C. § 405(g)[5] is limited to whether the Commissioner's decision is supported by substantial evidence in the record as a whole and whether the Commissioner applied the correct legal standards.  See White v. Massanari, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994)).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).  "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation omitted); Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004) (same).  The court neither reweighs the evidence nor substitutes its judgment for that of the Commissioner.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214.  This deferential standard of review, however, does not apply to the Commissioner's application of the law.  Grounds for reversal exist if the agency fails to apply the correct legal standards or fails to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

---

[5]  Although plaintiff's complaint is brought pursuant to 42 U.S.C. § 1383(c)(3), that section provides that the "final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 205(g) [42 U.S.C. § 405(g)] to the same extent as the Commissioner's final determinations under section 205 [42 U.S.C. § 405]."  42 U.S.C. § 1383(c)(3).

### IV.  Analysis

#### A.  The ALJ's Decision at Step Two

"The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled." Doyal, 331 F.3d at 760.  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).  Those five steps are as follows:

> (1)  A person who is working is not disabled.
> (2)  A person who does not have an impairment or combination of impairments severe enough to limit the ability to do basic work activities is not disabled.
> (3)  A person whose impairment meets or equals one of the impairments listed in the regulations is conclusively presumed to be disabled.
> (4)  A person who is able to perform work she has done in the past is not disabled.
> (5)  A person whose impairment precludes performance of past work is disabled unless the [Commissioner] demonstrates that the person can perform other work.  Factors to be considered are age, education, past work experience, and residual functional capacity.

Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir. 1988) (citing 20 C.F.R. § 416.920(a)-(f)) (internal citations omitted).  In this case, the ALJ determined that plaintiff was not disabled at step two.

"At step two, it is the claimant's burden to demonstrate an impairment, or a combination of impairments, that significantly limit her ability to do basic work activities." Langley, 373 F.3d at 1118 (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1521).  "The step two severity determination is based on medical factors alone, and 'does not include consideration of such vocational factors as age, education, and work experience.'" Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003) (citation omitted).  If the claimant is unable to show that his or her impairments would have more than a minimal effect on his or her ability to do basic work activities, the claimant is not eligible for disability benefits. Williams, 844 F.2d at 751.  If, on the other hand, the claimant presents medical evidence and makes the de minimus

8

showing of medical severity, the decision maker must proceed to step three. Id. But see Williamson, 350 F.3d at 1100 (citations omitted) (recognizing the "de minimus" standard, but stating that "the mere presence of a condition is not sufficient to make a step-two showing").

The ALJ concluded from a review of plaintiff's medical evidence that she did not have a credible, medically-established severe physical or mental impairment, but "only slight abnormalities not significantly limiting the performance of any basic work activities." While plaintiff claimed that her condition caused her difficulty sleeping, concentrating, driving a car, and standing for long periods, the ALJ found that her daily activities were restricted by her choice, rather than any apparent medical reason. In support, he noted that no treating doctor stated or implied that plaintiff was disabled; no doctor placed any limitations on her abilities to stand, sit, walk, bend, lift or carry; and that no doctor ever detected the offensive body odor alleged by plaintiff. As to any severe mental impairment, the ALJ cited the evaluations performed by Dr. Horner, who did not impose any restrictions on her ability to work, and the letter from Mr. Buhman-Wiggs, who declined to pronounce her disabled after providing several provisional diagnoses. The ALJ noted that the other evidence of plaintiff's mental health treatment did not demonstrate any significant long-term impairments with regard to her abilities to think, communicate, concentrate, get along with others, and cope with normal work stress. The ALJ also commented that plaintiff was able to complete her college degree and take graduate level courses during the period of her alleged illness.[6]

Finally, the ALJ observed that plaintiff had not taken any medication over the past six years[7] and that

---

[6] The record indicates that plaintiff received her college degree in 1998 and completed some graduate courses between 1999 and 2003.

[7] Plaintiff testified at the ALJ hearing that although she was not presently taking any medications, she took liquid vitamins and other supplements to help her condition.

she had refused without good reason the standard medical tests that might corroborate her alleged condition. Instead, the ALJ noted, plaintiff pursued a course of self-diagnosis by extensively researching the possible causes of her alleged condition and contacting numerous medical sources, some outside of the United States, regarding possible diagnosis and treatment. To this end, the ALJ stated that the record was "replete with medical journal articles, personal chronicles, and long, articulate, interpretive written accounts of a self-diagnosis nature."

### B. Plaintiff's Criticisms of the ALJ's Decision

Plaintiff asserts that between September 1995 and October 1997, she suffered from intestinal toxemia, resulting in offensive body odor and severe halitosis caused by toxic substances in her gut. In October 1997, she states that her symptoms went beyond body odor and halitosis and progressed to encephalopathy, which included symptoms of chills, dizziness, fatigue, as well as brain dysfunction.

Plaintiff acknowledges that her illness is not currently recognized in the United States. Thus, she attributes the absence of a diagnosis in her medical record to the current medical opinion regarding her illness. Plaintiff explains that the medical community lacks the knowledge and overall education regarding intestinal toxemia and the possibility that halitosis can occur as the result of "dysbiosis of the intestinal microflora." She believes that the methods and guidelines employed by doctors related to her illness are not scientifically valid and thus self-diagnosis became a necessity. Plaintiff states that is "medically feasible" to prove her illness because it is "possible" to have "appropriate breath, blood and/or stool testing performed in . . . approved medical laboratory facilities . . . ." She cites to numerous medical journal articles in which she claims that the testing to prove her illness has been performed. Plaintiff maintains that she is still in the stages of discovering the proper processes to receive appropriate diagnostic testing, and that the chance of receiving such treatment

is more likely in other countries.

Plaintiff mounts several attacks on the ALJ's decision.[8] Specifically, she argues that the ALJ erred by: failing to give substantial weight to the medical literature she submitted; denying her request to subpoena a witness from the Missouri Board of Healing Arts; and stating that her work record did not demonstrate a person well-motivated to work outside the home. Moreover, plaintiff generally argues that the ALJ's decision is not supported by substantial evidence. The court will address these arguments in turn.

### 1. Weight Assigned to Medical Journals

Plaintiff contends that the ALJ failed to give proper weight to the medical literature she submitted in support of her condition. The court disagrees. As the Tenth Circuit has stated:

> The determination of disability rests on medical opinions. Medical opinions are "statements from . . . acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1572(a)(2). Acceptable medical sources are defined at 404.1513(a). Medical journal articles are not included as acceptable medical sources. We cannot give persuasive authority to an attorney's extrapolation of a medical article to his client's condition. See, e.g., Soc. Sec. Rule. 96-5p, 1996 WL 374183, at *4 (clarifying that medical source statements must be submitted by acceptable medical sources and are to be based on the medical sources' personal knowledge of the claimant). *While medical literature can be cited and relied on to support a claimant's position, it cannot be the only evidence showing disability.*

McKinney v. Barnhart, 62 Fed. Appx. 284, 286 (10th Cir. 2003) (emphasis added).

Plaintiff concedes that her illness is not recognized by the medical community, and consistent with this notion, the record lacks any diagnosis from a treating physician that plaintiff suffers from her alleged intestinal

---

[8] The court assures plaintiff that it has carefully considered the arguments in her initial brief and reply brief. In the interest of brevity, however, some unsupported arguments and irrelevant points have been excluded from this opinion.

condition. As the ALJ correctly noted, plaintiff continually refused to undergo standard medical testing. Rather, plaintiff has preferred to diagnose her alleged condition through her own research and has sought treatment in facilities outside of the United States. The medical journals proffered by plaintiff are the only evidence supporting her position and may not be properly considered without further corroboration from an acceptable medical source. Accordingly, the court concludes that the ALJ did not err by failing to assign plaintiff's medical literature substantial weight.

## 2. Failure to Subpoena an Expert Witness

Next, plaintiff argues that the ALJ erred when he denied her request to subpoena a member of the Missouri Board of Healing Arts. She claims that a representative of that entity was necessary to address the inconsistency between current clinical medical practices and the scientific evidence proving her illness, and additionally, to verify that any doctor she sought treatment from would be subject to penalties if the doctor followed the correct methods for diagnosing and treating her illness.

Social Security regulations authorize an ALJ to subpoena a witness or document at the request of a party "[w]hen it is reasonably necessary for the full presentation of a case." 20 C.F.R. § 404.950(d)(1). To request the issuance of a subpoena, a party must file a written request with the ALJ at least five days before the date of the hearing; provide the names of the witnesses or documents to be produced; describe the location of the witness or document with sufficient detail; state the important information that the witness or document is expected to prove; and show why the information could not be proven without the issuance of a subpoena. Id. § 404.950(d)(2).

On March 16, 2004, the Social Security Appeals Office received the following request from plaintiff: "If you find it necessary, I would also like to request communications . . . via subpoena[] with the Missouri

Board of Healing Arts for substantiation of any of my evidence." The court determines that the ALJ's failure to subpoena a Missouri Board of Healing Arts representative was not reversible error. Plaintiff' request was untimely, as she sent it over four months after the ALJ's hearing. Moreover, even assuming her request complied with the requirements for issuing a subpoena, the court would conclude that the ALJ did not abuse its discretion given the lack of objective medical evidence in the record supporting plaintiff's alleged impairment and her acknowledgment that current medical opinion does not recognize her condition.

### 3. The ALJ's Credibility Determination

Lastly, plaintiff challenges the ALJ's statement that her poor work record did not enhance her credibility as a person who was ever motivated to work outside of the home.[9] Plaintiff claims that this statement is discriminatory and without support in the record. She states that the ALJ never gave her the opportunity to explain the circumstances surrounding her choice to stay at home with her children while they were young and to attend college so she could obtain a well-paying job. Rather, she contends that the ALJ used his inappropriately formed opinion as a basis for discrediting her extensive evidence of intestinal toxemia.

Because the ALJ is "'optimally positioned to observe and assess witness credibility,'" Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)), the court "may overturn such a credibility determination only when there is a conspicuous absence of credible evidence to support it," Patterson v. Apfel, 62 F. Supp. 2d 1212, 1217 (D. Kan. 1999) (citing Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992)). Credibility determinations made by the ALJ are generally treated as binding upon review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990).

---

[9] Plaintiff had no reported job earnings after 1992. Her past work experience included employment as a customer service clerk, stocker, and waitress.

13

The court agrees with plaintiff that her decision to stay at home with her children and to attend college to improve her family's standard of living is commendable and provides an explanation for her lack of job earnings during the relevant time period. The ALJ's credibility determination, however, was not based solely on plaintiff's work record, but also on the lack of objective medical evidence in the record to support her alleged disability.[10] As explained below, the court finds that the ALJ's decision is supported by substantial evidence in the record. Thus, plaintiff's disagreement with the ALJ's interpretation of her work history does not provide a basis for reversing the ALJ's decision.

### C.  The ALJ's Decision is Supported by Substantial Evidence

The court concludes that the ALJ's decision at step two, in which he determined that plaintiff had no more than minimal limitations in her ability to do basic work activities, is supported by substantial evidence.

It is undisputed that intestinal toxemia with encephalopathy is not recognized by current medical opinion, and therefore, plaintiff's alleged illness is not a medically determinable condition that satisfies the definition of "disability." See 42 U.S.C. § 423(d)(1)(A) (defining disability as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment); see also Williamson, 350 F.3d at 1099-1100 (quoting 42 U.S.C. § 423(d)(3)) ("An impairment giving rise to disability benefits is defined as one which 'results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.'"); 20 C.F.R. § 404.1520(c) (stating that a claimant at step two must establish "a severe medically determinable physical or mental impairment that meets

---

[10]  In fact, immediately after the ALJ commented on plaintiff's work history, he stated: "For this *and for the other reasons to follow*, the undersigned finds the preponderance of the medical and other evidence to be inconsistent with the claimant's allegation of disability" (emphasis added).

14

the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement"). Furthermore, as stated earlier, plaintiff's medical literature alone cannot provide a basis for proving her alleged disability.

The medical evidence in the record shows that plaintiff does not suffer from a medically determinable severe physical or mental impairment. As the ALJ correctly observed, no treating doctor opined that plaintiff was limited in her physical abilities. While there exists some evidence of mental impairment, Dr. Horner evaluated plaintiff on two occasions and each time opined that plaintiff's mental state did not warrant any restrictions on her ability to work. Moreover, plaintiff states in her reply brief that "she has never claimed any psychological impairments" and that she does not have any. Plaintiff's refusal to pursue standard medical testing for her alleged illness, as well as her failure to take any medications during the relevant time period, further substantiates the ALJ's decision.

Accordingly, the court finds that plaintiff has not satisfied her burden to prove that she is disabled.

**IT IS THEREFORE BY THE COURT ORDERED** that the Commissioner's decision is affirmed.

**IT IS SO ORDERED** this 28th day of July, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

15